UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TENNESSEE

SOUTHERN DIVISION (CHATTANOOGA)

ALEXIS DANIEL,

Plaintiff, Pro Se,

v.

**THE UNIVERSITY OF TENNESSEE AT CHATTANOOGA**;

**THE UNIVERSITY OF TENNESSEE BOARD OF TRUSTEES**;

**MARK WHARTON**, Vice Chancellor & Director of Athletics, in his official and individual capacities;

**ANITRA BARRETT**, Title IX Coordinator, in her official and individual capacities;

**LAURA HERRON**, Executive Associate Athletics Director, in her official and individual capacities;

**GRACIE THURSON**, Assistant Athletic Trainer, in her official and individual capacities;

**LELAND MALLOY**, Academic Advisor, in his official and individual capacities;

**KEVIN RODRIGUEZ**, Assistant Director of Athletics Performance, in his official and individual capacities;

FILED
FEB 26 2026
Clerk, U. S. District Court
Eastern District of Tennessee
At Chattanooga

1

**COLETTE MURRAY**, Former Head Coach, Women's Golf, in her individual capacity;

**SARAH BUSEY**, Former Assistant Coach, Women's Golf, in her individual capacity;

**EVAN WILSON**, Former Director of Sports Medicine, in his individual capacity;

Defendants.

Case No.: 1-26-CV-48



FILED
FEB 26 2026
Clerk, U. S. District Court
Eastern District of Tennessee
At Chattanooga

**Jury Trial Demanded**

---

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

### I. INTRODUCTION

1. This is a civil rights and negligence action brought by Plaintiff Alexis Daniel, a former student-athlete at the University of Tennessee at Chattanooga (UTC). Plaintiff seeks redress for a catastrophic Traumatic Brain Injury (TBI) sustained during an unsupervised, mandatory athletic activity on March 7, 2025.

2. Following the injury, Defendants engaged in a coordinated effort to deny Plaintiff mandated medical care, circumvent NCAA Concussion Safety Protocols, retaliate against her by revoking athletic and academic support, and fraudulently attempt to settle potential liability through an unauthorized "housing scholarship."

3. Plaintiff brings this action under Title IX of the Education Amendments of 1972, Title II of the Americans with Disabilities Act (ADA), Section 504 of the Rehabilitation

Act, 42 U.S.C. § 1983, and pendent state tort laws.

## II. JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 (Federal Question) and 28 U.S.C. § 1343 (Civil Rights).

5. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a). Plaintiff has concurrently filed an administrative Notice of Claim with the Tennessee Division of Claims and Risk Management to satisfy state exhaustion requirements.

6. Venue is proper in the Eastern District of Tennessee pursuant to 28 U.S.C. § 1391(b), as the events giving rise to these claims occurred in Hamilton County, Tennessee, and the institutional Defendants are located within this District.

## III. PARTIES

7. **Plaintiff Alexis Daniel** is an adult citizen of the United States and was an enrolled student-athlete on the women's golf team at UTC during the events in question.

8. **Defendant University of Tennessee at Chattanooga (UTC)** is a public university receiving federal financial assistance, subjecting it to Title IX, the ADA, and Section 504.

9. **Defendant University of Tennessee Board of Trustees** is the governing body of UTC.

10. **Defendants Wharton, Barrett, Herron, Thurson, Malloy, Rodriguez, Murray, Busey, and Wilson** were at all relevant times employees and/or agents of UTC acting under the color of state law and are sued in their official and/or individual capacities as specified in the caption.

## IV. FACTUAL ALLEGATIONS

### The March 7, 2025 Incident and State-Created Danger

11. On Wednesday, March 5, 2025, during a scheduled team workout, Defendant Busey informed Defendant Rodriguez that Plaintiff and another student-athlete would not be traveling for competition and were required to perform a mandatory workout on Friday, March 7, 2025.

12. Defendant Rodriguez explicitly informed Defendant Busey and the Plaintiff that he would be physically absent from the Friday workout but stated he would provide the specific training protocol for the athletes to execute in his absence.

13. On the evening of Thursday, March 6, 2025, Plaintiff contacted Defendant Rodriguez via text message to confirm the workout details. Defendant Rodriguez instructed the Plaintiff to enter the facility at 6:45 AM the following morning, stating: "It is on my desk on the clipboard. You can go in at 6:45am."

14. On the morning of March 7, 2025, Plaintiff and her teammate arrived at the UTC athletic facility as instructed. Upon entry, Plaintiff found the gym doors closed and the lights off. Despite the facility being unlocked, no members of the UTC athletic staff,

4

training staff, or strength and conditioning department were present.

15. This environment constituted a direct violation of both UTC Athletics and NCAA safety mandates, which strictly prohibit student-athletes from utilizing weight room facilities without the physical presence of a certified staff member.

16. Plaintiff was placed in an impossible "Catch-22" scenario created by Defendant Murray and Defendant Busey:

* If Plaintiff skipped the workout due to the lack of supervision, she faced severe athletic punishment and potential loss of athletic scholarship and standing from Defendant Murray.

* If Plaintiff followed the instructions of Defendant Rodriguez, she was forced to perform high-risk athletic maneuvers in a dangerous and unsupervised environment.

17. The necessity for the Plaintiff and her teammate to manually activate the facility's lighting serves as a physical record of the Defendants' total abandonment of their safety obligations. This unstaffed environment stood in direct violation of UTC and NCAA safety mandates. Consequently, the Plaintiff was trapped in a state-created danger: she was under an affirmative, compulsory order to perform high-risk athletic maneuvers, yet was stripped of the very professional supervision and monitoring UTC was legally and contractually obligated to provide.

18. This total failure to supervise was the proximate cause of the environment that allowed the Plaintiff to suffer a severe and catastrophic blow to the head, resulting in a

5

Traumatic Brain Injury (TBI).

**The Injury, ER Visit, and Actual Notice**

19. On the late morning of Saturday, March 8, 2025, Plaintiff awoke experiencing severe, ongoing head pain, profound cognitive fog, and acute neurological distress after attempting to self-treat her escalating symptoms with Tylenol and ice throughout the prior evening. Directly resulting from the cognitive impairment and confusion caused by her unmonitored Traumatic Brain Injury, Plaintiff attempted to text the single teammate remaining on campus to advise that she was delayed, intending to write, "I won't be there till a little later today, maybe 2pm." However, due to her severely impaired state, Plaintiff mistakenly sent this message to a group chat of teammates who were traveling for competition and temporarily unreachable.

20. **Actual Notice to Sports Medicine and Failure to Intervene:** As her neurological symptoms continued to rapidly deteriorate that afternoon, Plaintiff recognized she was experiencing a major medical emergency and directly contacted Defendant Thurson (Assistant Athletic Trainer) at 2:09 PM. Via text message, Plaintiff formally reported the Friday morning workout incident and her escalating symptoms. Plaintiff informed Defendant Thurson that she was extremely tired and had been experiencing headaches since the accident, alongside visible trauma including a cut on her nose and enlarging contusions on her scalp and forehead. Plaintiff explicitly requested medical guidance, writing: *"I don't know if I should go seek medical attention or what. I just know that I have slight headaches, and the bumps on my head are bigger than yesterday."*

21. **Medical Abandonment and the Forced ER Visit:** Despite receiving actual, documented notice of a head injury, worsening neurological symptoms, and a direct plea for medical guidance, Defendant Thurson failed to respond. Abandoned by the university's sports medicine staff and left without transportation, Plaintiff was placed in a position of extreme peril: she was forced to operate a motor vehicle while neurologically impaired, driving herself to the Parkview Hospital Emergency Room—located approximately five to seven minutes from campus—to secure her own emergency medical diagnosis and intervention directly adding to the state-created danger.

22. **Actual Notice to Coaching Staff:** Shortly thereafter, at 3:44 PM, Defendant Murray (Head Coach) called the Plaintiff after the traveling teammates concluded their golf round and finally viewed the Plaintiff's misdirected text message regarding the ER. During this phone call, Plaintiff verbally confirmed the ER visit and her severe concussion diagnosis directly to her Head Coach.

23. **Systemic Deliberate Indifference:** By 3:45 PM on Saturday, both the Sports Medicine department (via the 2:09 PM text) and the Head Coach (via the 3:44 PM phone call) had actual, documented knowledge of a catastrophic head injury requiring hospital intervention. Despite this, Defendant Murray and Defendant Busey entirely failed to follow up with the Sports Medicine staff to ensure their student-athlete was receiving the mandatory NCAA concussion care. Shockingly, Defendant Thurson did not respond to the Plaintiff's emergency 2:09 PM medical text until 9:12 PM on Sunday, March 9, 2025—over 31 hours after receiving explicit notice of the head trauma, and

more than 60 hours after the injury occurred on UTC premises.

**Asset Dumping**

24. **The Forced Evacuation and Improper Delegation of Duty:** Having been medically abandoned by the UTC Sports Medicine staff throughout the critical 48-hour window following the injury, Plaintiff was left with no safe harboring on campus. To ensure her basic medical survival, Plaintiff was forced to return to her home state to seek out-of-pocket medical care from a local sports physician.

25. **Constructive Abandonment via Remote Checklists:** Between March 9 and March 28, 2025, Defendant Thurson engaged in periodic text communication but completely failed to provide the mandated clinical standard of care. Instead of facilitating oversight by the UTC Team Physician or activating the university's "Return-to-Learn" academic protocols, Defendant Thurson improperly delegated UTC's institutional duties directly onto the injured Plaintiff. Defendant Thurson instructed Plaintiff to self-manage her Traumatic Brain Injury via a "symptom checklist" and demanded medical clearance notes from Plaintiff's local, out-of-state physician. This remote "monitoring" was a calculated deviation from NCAA protocols, designed to shift the burden of care away from the university while keeping Plaintiff off the official, reportable UTC injury ledger.

26. **The March 29 Evaluation and the "Gatekeeping" Confession:** Plaintiff did not receive an in-person clinical evaluation from UTC medical staff until March 29, 2025, a full 22 days post-injury, upon her return to campus. Plaintiff possesses a 25-minute audio recording of this delayed encounter. During the recording, Defendant Thurson

8

conducts baseline comparisons but openly admits to intentionally modifying and restricting standard evaluation protocols, telling the Plaintiff, "we don't need to do the whole stack," and confirming she would rely solely on the basic symptom logging.

27. **The "Symptom-Free" Physician Blackout:** In the same recording, Defendant Thurson confirmed she was actively gatekeeping the Plaintiff from physician-level care based on a coordinated directive from Dr. Gary Wilkerson. Thurson stated, "He said he wants to see you once you're symptom free so that he can like go through the concussion protocol with you, but we won't start anything until you're symptom free." This directive explains the preceding three weeks of remote checklist-management: Defendant Thurson and the UTC Sports Medicine department intentionally used a "symptom-free" prerequisite to block Plaintiff from seeing the Team Physician, deliberately denying her the acute medical oversight required to manage active brain trauma and implement academic protections.

## Revocation of Facility Access and Academic Support Disparities

28. The Plaintiff's card access to the athletic arena, training facilities, indoor golf team room, and sports medicine care was revoked. This coordinated isolation stripped the Plaintiff of the essential "benefits of the program" under Title IX and the ADA.

29. Furthermore, Defendants violated NCAA "Return-to-Learn" protocols. While male student-athletes in revenue sports receive concierge-level advocacy—where Student-Athlete Academic Support Services (SAASS) staff directly notify professors and manage academic logistics upon an injury diagnosis—Plaintiff was abandoned.

9

Defendant Malloy (Academic Advisor) and Defendant Herron (Executive Associate AD) completely failed to activate this protocol, forcing the Plaintiff to independently stare at screens, draft emails to professors, and negotiate her own academic survival while actively suffering from a severe neurological injury.

**Targeted Isolation and Communication Blackout**

30. Following the injury, Defendant Murray performed an unauthorized manual adjustment to the Plaintiff's data within the Teamworks platform. This administrative override was designed to limit the Plaintiff's visibility and access to team-wide scheduling and logistics, despite the Plaintiff remaining an officially enrolled student-athlete.

31. In a calculated maneuver to isolate the Plaintiff, Defendant Murray and Defendant Busey abandoned the established team-wide WhatsApp group chat thread. In its place, they exclusively utilized a "Travel Team" chat thread. While the teammate who was with the Plaintiff at the time of the TBI was added to this new thread, the Plaintiff was intentionally excluded. This "shadow thread" became the sole source of team coordination, effectively blacking out the Plaintiff from her athletic community.

32. This exclusion was not a clerical oversight. Prior to these actions, Defendant Murray sent the Plaintiff a text message asking, "Would it be better to remove you from the team group text..." to which the Plaintiff replied, "No I'll just mute it," indicating an explicit request to remain included in all team communications. By intentionally manipulating Teamworks data and bypassing the main WhatsApp thread, Defendant Murray acted

10

with malice and deliberate indifference toward the Plaintiff's status and medical well-being.

## Administrative Deliberate Indifference and Failure to Investigate

33. On April 18, 2025, Plaintiff provided formal written notice of the injury, retaliation, and denial of care to UTC administration. Defendant Barrett (Title IX Coordinator) and Defendant Wharton (Athletic Director) failed to investigate the retaliation or the disparate treatment Plaintiff received compared to male student-athletes reporting similar injuries.

## The Fraudulent "Scholarship" Application

34. In an attempt to mitigate liability and create a fraudulent "Accord and Satisfaction," Defendants orchestrated the unilateral application of funds, labeled as an "athletic housing scholarship," to Plaintiff's student account.

35. Defendant Busey inexplicably notified the Plaintiff of this "scholarship" shortly after the concussion. Plaintiff never accepted this award through the university's MyMocsNet portal, nor was a scholarship agreement ever signed.

36. This unsolicited credit was manually overridden by UTC administrators to zero out the Plaintiff's balance prior to her May graduation, constituting an implicit admission of liability and a breach of standard financial aid protocols. Plaintiff explicitly held these funds under protest.

37. **Arbitrary Denial of Medical Claims and Financial Retaliation:** Following Plaintiff's forced evacuation to secure medical care, Defendant Wilson arbitrarily and selectively refused to process specific medical bills through the university's athletic insurance apparatus. Specifically, Defendant Wilson refused to process the billing from Baptist Health for dates of service on March 13, March 25, and May 1, 2025. Crucially, these specific unpaid bills represent the initial evaluations by the outside sports physician (Dr. Mark Puckett) who officially diagnosed and documented the Traumatic Brain Injury while UTC was actively gatekeeping Plaintiff's care.

38. Conversely, Defendant Wilson did authorize payment for subsequent, later-stage physical therapy (University of Cincinnati [UC] Health and Kort Physical Therapy). This selective refusal to pay the foundational diagnostic bills was an arbitrary, punitive administrative action. It was designed to financially penalize the Plaintiff for seeking outside emergency care and to further suppress the official, earliest diagnostic records of the head trauma from the university's internal ledger.

## V. CAUSES OF ACTION

### COUNT I: Violation of Title IX of the Education Amendments of 1972

*(Against Defendant UTC and the Board of Trustees)*

39. Plaintiff incorporates all preceding paragraphs.

40. Defendants discriminated against Plaintiff on the basis of sex by denying her equal medical care, athletic training supervision, and academic support services, in direct

violation of 34 C.F.R. § 106.41(c)(5) ("Opportunity to receive coaching and academic tutoring").

41. Specifically, male student-athletes at UTC (such as Keionta Davis, Shane Heatherly, and Nick Davison) who sustain head injuries are provided immediate removal from play, formal evaluations by Team Physicians, and are not subjected to unsupervised solo workouts in locked facilities. Furthermore, male athletes receive automatic, concierge-level academic advocacy from SAASS to navigate "Return-to-Learn" protocols. In stark contrast, Plaintiff was medically abandoned, denied access to Team Physicians Dr. Bruce and Dr. Garrett, and forced to self-advocate her academic accommodations while symptomatic.

42. Defendants retaliated against Plaintiff for her ongoing protected activities, which included her repeated requests for the equivalent medical care provided to male athletes and her formal written notice of disparate treatment on April 18, 2025. Upon receiving actual notice of Plaintiff's demands for equitable treatment, Defendants engaged in a coordinated campaign of materially adverse actions. Specifically, Defendants unlawfully revoked her athletic status, severed her facility access, manipulated "Teamworks" data to isolate her, and intentionally withheld the SAASS academic advocacy that is automatically granted to male athletes . This retaliation was designed to force Plaintiff out of the athletic program as punishment for seeking Title IX compliance.

**COUNT II: Violation of the Americans with Disabilities Act (Title II) and Rehab Act**

**(Section 504)**

*(Against Defendant UTC and the Board of Trustees)*

43. Plaintiff incorporates all preceding paragraphs.

44. Plaintiff's severe Traumatic Brain Injury (TBI) qualifies as a disability under the ADA and Section 504. Defendant UTC did not merely fail to accommodate this disability; it acted with deliberate indifference to Plaintiff's federally protected rights. Despite having actual, documented knowledge of Plaintiff's severe cognitive impairment, UTC administrators and Sports Medicine staff intentionally gatekept Plaintiff from the Team Physician. By imposing an unauthorized 'symptom-free' prerequisite for physician access, Defendants actively blocked the activation of the university-mandated "Return-to-Learn" protocols, willfully denying Plaintiff the reasonable accommodations necessary for her academic survival.

45. By actively obstructing these necessary, documented accommodations, and forcing a neurologically impaired student to self-manage her academic survival without the institutional support provided to others, Defendant UTC intentionally discriminated against Plaintiff. This deliberate indifference effectively excluded Plaintiff from participation in, and denied her the benefits of, the University's educational and athletic programs solely by reason of her disability.

**COUNT III: 42 U.S.C. § 1983 - 14th Amendment Due Process (State-Created Danger)**

*(Against Defendants Murray, Busey, Rodriguez, Malloy, Wilson, Wharton, Thurson, Herron, Barrett)*

46. Plaintiff incorporates all preceding paragraphs.

47. Defendants, acting under color of state law, affirmatively placed Plaintiff in a position of special, particularized danger. Defendants utilized their state-granted coercive authority over Plaintiff's athletic and academic standing to explicitly mandate the execution of a high-intensity athletic workout. Furthermore, Defendants isolated Plaintiff from the general student body, specifically ordering her into a dark, closed weight room facility, forcing her to manually activate the lights, and affirmatively stripping away the legally mandated, professional supervision required for these high-risk physical maneuvers by the NCAA.

48. By coercing the Plaintiff into this 'Catch-22' scenario, Defendants acted with deliberate indifference. Defendants Murray, Busey, and Rodriguez possessed actual, subjective knowledge that forcing a student-athlete to perform these specific high-risk physical maneuvers without the mandated supervision posed an extreme and immediate risk of severe bodily injury. Despite this actual knowledge, they consciously disregarded the risk by prioritizing athletic compliance over Plaintiff's physical survival. This egregious, affirmative coercion shocks the conscience and demonstrates a reckless disregard for Plaintiff's bodily integrity.

49. Defendant Wilson and Defendant Wharton, in their supervisory capacities, possessed actual, subjective knowledge of the pervasive practice of coaching staff

mandating unsupervised, high-risk athletic workouts. Rather than intervening, Defendants affirmatively authorized and knowingly acquiesced to this dangerous practice. By actively condoning the removal of legally mandated safety oversight, Defendant Wharton and Defendant Wilson implicitly authorized the precise coercive environment that trapped Plaintiff, directly facilitating and proximately causing her catastrophic TBI.

50. **Waiver Exception (T.C.A. § 9-8-307(b)) and Defeat of Qualified Immunity – Acts Outside the Scope of Employment:** Plaintiff explicitly pleads that the waiver provision of Tennessee Code Ann. § 9-8-307(b) does not apply to the individual Defendants named herein, nor are they shielded by Qualified Immunity. Their specific acts and omissions violated clearly established constitutional rights and were malicious, willful, fraudulent, and performed for personal self-preservation, thereby falling strictly outside the scope of their legitimate state employment.

> **(a) Willful Dereliction of Duty, Coercion, and Reckless Endangerment (Defendants Rodriguez, Busey, and Murray):** The actions of these Defendants transcend gross negligence and constitute a coordinated, intentional abandonment of their non-delegable duty of care. Defendant Rodriguez committed an affirmative act by instructing Plaintiff to access a dark, unstaffed athletic facility to execute high-risk maneuvers, explicitly pre-planning his own absence ("clipboard on the desk"). Crucially, Defendant Busey possessed actual, advance knowledge of Defendant Rodriguez's planned absence. Despite knowing the facility would be unmonitored, a direct violation of UTC and NCAA safety mandates, Defendant

16

Busey affirmatively compelled the Plaintiff to execute the workout. Furthermore, Defendant Murray established and enforced the coercive environment wherein failure to comply with Busey's dangerous mandate would result in severe athletic punishment and the revocation of Plaintiff's athletic status. By weaponizing the threat of financial aid package loss to force compliance with a known, unsafe directive, the coaching staff intentionally trapped Plaintiff in a state-created danger. This coordinated subversion of institutional safety protocols was executed solely for their own personal convenience and control, constituting ultra vires conduct and deliberate indifference.

**(b) Malicious Retaliation and State-Created Danger (Defendant Murray and Defendant Busey):** The coordinated campaign to isolate the Plaintiff, manipulate "Teamworks," and psychologically abuse her after a reported injury constitutes intentional malice unrelated to any legitimate educational or athletic objective. Defendant Murray and Defendant Busey engaged in intentional retaliation, social isolation, and the creation of a "State-Created Danger" for the malicious purpose of forcing the Plaintiff off the roster. Their actions—including the mocking of Plaintiff's injury—were willful acts of personal malice and were not motivated by any legitimate coaching purpose.

**(c) Fraudulent Concealment and Constructive Medical Abandonment (Defendant Wilson and Defendant Thurson):** The deliberate decision to withhold an initial clinical evaluation for 22 days, substituting it with remote self-reporting checklists while refusing to activate "Return-to-Learn" academic protocols,

17

constituted acts of "deliberate indifference." As confirmed by audio recording, the Sports Medicine staff intentionally gatekept Plaintiff's medical file from the official Team Physician. They operated under an unconstitutional directive to refuse physician-level evaluation until the Plaintiff was "symptom-free," intentionally subverting NCAA mandates to avoid triggering institutional oversight. These acts of administrative cover-up and medical gatekeeping shock the conscience and fall entirely outside the scope of legitimate state employment.

**(d) Institutional Cover-Up, Financial Fraud, and Personal Gain (Defendant Wharton, Defendant Herron, Defendant Wilson, Defendant Malloy):** These administrators willfully suppressed mandatory NCAA concussion filings, intentionally refused to activate Student-Athlete Academic Support Services (SAASS) protocols, and arbitrarily manipulated financial aid and insurance apparatuses to financially penalize the Plaintiff. The selective refusal to process specific diagnostic medical bills, combined with the orchestration of unauthorized "scholarship" funds, were intentional acts of administrative fraud designed to protect the Defendants' personal careers and the Department's reputational standing. This was a calculated administrative maneuver intended to avoid NCAA sanctions, establish a safe harbor of institutional liability, and protect their own professional reputations and continued employment (personal gain), rather than mere negligence or a legitimate exercise of university policy.

**(e) Bad Faith and Corrupted Process (Defendant Barrett): Defendant Barrett (Title IX Coordinator)** abdicated her duty as a neutral investigator. Instead of conducting an impartial inquiry, she summarily denied Plaintiff's initial claim in direct response to external pressure and demand letters from Christine Brown. This capitulation to external legal aggression for the purpose of protecting the University's brand constitutes a willful violation of Plaintiff's Due Process rights.

These intentional acts of self-preservation, deliberate indifference, and fraud sever the employer-employee relationship for liability purposes, rendering these Defendants personally liable under 42 U.S.C. § 1983 and stripping them of any claim to Qualified Immunity.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against Defendants and award the following relief:

A. Compensatory damages for medical expenses, pain and suffering, emotional distress, and loss of educational and athletic benefits. Such damages are sought against Defendant UTC and the Board of Trustees under Counts I and II, and against the individual Defendants in their individual capacities under Count III;

B. Punitive damages against the individual Defendants in their individual capacities only, for their willful, wanton, deliberate, and reckless disregard of Plaintiff's constitutional and civil rights;

19

Case 1:26-cv-00048-CLC-CHS   Document 1   Filed 02/26/26   Page 19 of 20   PageID #: 19

C. Declaratory and prospective injunctive relief against Defendant UTC and the official-capacity Defendants, requiring the reformation of Sports Medicine oversight, Title IX compliance, and SAASS academic support protocols to prevent further constitutional and statutory violations;

D. Plaintiff's costs of litigation pursuant to Fed. R. Civ. P. 54(d), and, should Plaintiff subsequently retain counsel, reasonable attorney's fees pursuant to 42 U.S.C. § 1988 and applicable statutory provisions; and

E. Any other relief the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted this 23rd day of February, 2026.

*Alexis Daniel*

**Alexis Daniel, Plaintiff Pro Se**

1004 Timberwood Court

Coxs Creek, Kentucky 40013

(502) 264-2845

alexismdaniel02@gmail.com